Stephen WIGGINS and Jane Wiggins, Husband and Wife, Plaintiffs and Appellees,

v.

Roger A. SHEWMAKE and Jean C. Shewmake, Husband and Wife, Separate Defendants, Third Party Plaintiffs and Appellants.

No. 14565.

Supreme Court of South Dakota.

Considered on Briefs Nov. 29, 1984.

Decided Sept. 6, 1985.

---

George S. Mickelson of Mickelson & Helsper, Brookings, for plaintiffs and appellees.

Robert G. Fite, Brookings, for separate defendants, third party plaintiffs and appellants.

MORGAN, Justice.

Defendants appeal a grant of specific performance and consequential damages by the circuit court following trial of an action for the breach of a contract for purchase of residential real estate. We affirm.

Plaintiffs, Stephen and Jane Wiggins (Wiggins), listed their home in Brookings, South Dakota, for sale on July 7, 1983, with Wendell Thompson (Thompson), doing business as Brookings Real Estate Center. This listing was obtained by Marie Harlan (Harlan), an agent of Thompson. Through various contacts, Harlan learned that the defendants Roger and Jean Shewmake (hereafter collectively Shewmakes, or Roger or Jean individually as appropriate), would be moving to Brookings and wrote them offering her services in helping them obtain housing. On July 17, 1983, Jean arrived in Brookings and called Harlan, who then took Jean on a tour of Brookings. During this tour, Harlan and Jean discussed what the Shewmakes were looking for in a house and what financing requirements were needed by the Shewmakes.

The following day, Jean and Harlan looked at approximately fifteen houses in the Brookings area, with the Wiggins home being the most attractive to Jean. She decided to make an offer on the Wiggins home and, with the help of Harlan, prepared a standard offer to purchase. Jean offered $64,500 for the home, including certain personalty. The offer, however, was contingent upon the buyer (Jean) obtaining a "13% conventional loan," and was subject to the approval of Roger. Wiggins rejected this offer and made a counteroffer. The counteroffer removed the contingency of Roger's approval. Jean accepted the counteroffer on July 19, 1983.

According to Shewmakes, the "13% conventional loan" contingency in the agreement meant fixed-rate financing amortized for a period of thirty years. Shewmakes inquired into the availability of such financing in the Brookings area and found that local financing institutions were not offering such terms at this time. Other, shorter term financing arrangements at the requested interest rate were available. Shewmakes were leery of governmentally insured financing programs and declined to investigate these.

Although Shewmakes were unable to obtain financing acceptable to them at this time, Roger informed Thompson that he intended to go through with the contract. In reliance upon Roger's conduct, the Wiggins entered into a one-year lease and took possession of another home.

Subsequently, Shewmakes became interested in financing through the South Dakota Housing Authority and applied for that

financing through Norwest Bank. It then became apparent that Shewmakes would not arrive in Brookings and close on the house until after the original closing date, so closing was postponed approximately one month, to September 16, 1983. Additionally, by that date, Shewmakes would know whether they had secured the loan through the South Dakota Housing Authority.

On August 21, 1983, Shewmakes arrived in Brookings and took possession of the Wiggins home under an "Agreement to Occupy Prior to Close." In this agreement, seller (Wiggins) and purchaser (Shewmakes) agreed to allow purchasers possession of the premises prior to taking of title. The agreement specifically referred to a purchase agreement dated July 18, 1983, and was signed by both Roger and Jean Shewmake.

On September 14, 1983, Shewmakes were informed that their South Dakota Housing Authority loan application had been denied. Jean then informed Wiggins that she and her husband did not intend to close on the home. Two days later, the agreed date for closing passed. Four days after that, Norwest Bank in Brookings, after being contacted by Thompson and Wiggins, executed a letter committing the bank to a 13% mortgage. Shewmakes vacated the home and it was again listed for sale. Approximately two months later, Shewmakes purchased a home in Brookings, financing the purchase with a loan at 11.75% interest for a seven-year term, ending in a balloon payment.

Following Shewmakes' refusal to close, Wiggins initiated this action on September 28, 1983, asking for relief by way of specific performance and consequential damages. Trial was held to the court in January, 1984, at which time the court granted the prayed for relief. Shewmakes claim several assignments of error in this determination.

We first note that the findings of the trial court will not be disturbed on appeal unless they are clearly erroneous. SDCL 15-6-52(a); *Jankord v. Jankord*, 368 N.W.2d 571 (S.D.1985). In applying this standard, we will overturn the findings of the trial court only when, after review of all the evidence, we are left with a definite and firm conviction that a mistake has been made. *Mobridge Community Ind. v. Toure*, 273 N.W.2d 128 (S.D.1978).

Initially, Roger contends that any oral agreement between himself and Wiggins is barred by the statute of frauds.[1] The trial court found that the "Agreement to Occupy Prior to Close," signed by Roger, constituted a memorandum sufficient to satisfy the requirements of the statute.

SDCL 53-8-2 requires that an agreement for the sale of real property be in writing, and subscribed by the party to be charged, before the agreement will be enforceable. The agreement itself need not be the writing relied upon, a memorandum evidencing the obligation is sufficient. SDCL 53-8-2. "The memorandum serves to furnish written evidence of the obligation to be enforced against the party who subscribes his name to the memorandum; that is, a memorandum is not required to make a contract but merely to evidence in writing that a contract has been entered into." *Drake v. Sample*, 279 N.W.2d 685, 689 (S.D.1979) *citing* 72 Am. Jur.2d *Statute of Frauds* § 285 (1974). The memorandum need not embody the exact terms of the contract; "it is sufficient that the substance of a contract for the purchase of real property is inferred from the writing[.]" *Drake*, 279 N.W.2d at 689. *See also Aamont v. Eneboe*, 352 N.W.2d 647 (S.D.1984).

---

1. SDCL 53-8-2 (statute of frauds) provides:
   The following contracts shall not be enforceable by action unless the same or some memorandum thereof be in writing and subscribed by the party to be charged or his agent, thereunto authorized in writing:
   . . . .

   (3) An agreement for the sale of real estate or an interest therein or lease of the same for a period longer than one year, but this does not abridge the power of any court to compel specific performance of any agreement for sale of real estate in case of part performance thereof.

■ On August 21, 1983, Roger signed an "Agreement to Occupy Prior to Close." This agreement referred to Shewmakes as "purchasers" and the Wiggins as "sellers." The purpose of the agreement was to allow purchasers to enter into possession of the premises prior to obtaining title. The agreement specifically noted that seller and purchaser had "executed a purchase agreement dated July 18, 1983." Although Jean actually accepted Wiggins' counteroffer on July 19, 1983, this defect in the "Agreement to Occupy Prior to Close" is not fatal. Portions of the July 19, 1983, purchase agreement specifically incorporated terms of the July 18, 1983, offer. The writing referred to in SDCL 53–8–2 need not be in one document, the writings may consist of disjointed memoranda or protracted correspondence. *Aamont, supra; Drake, supra.* As long as the substance of the contract can easily be inferred from the various writings, the requisites of the statute are met. *Aamont, supra; Drake, supra.*

■ Taken together, we conclude the writings constituted sufficient memoranda to charge Roger as a party to the purchase agreement and hold that the provisions of SDCL 53–8–2 have been met.

The trial court also found that Roger became a party to the purchase agreement under the doctrine of promissory estoppel. Roger contends the trial court erred in this determination. Because of our conclusion on the statute of frauds issue, we need not consider this question. *See Aamont, supra.*

Shewmakes next argue that the purchase agreement was not a sufficiently definite agreement so as to be enforceable by specific performance. Specifically, they contend that the contingency of the purchaser "obtaining a 13% conventional loan" is too ambiguous to give rise to the remedy of specific performance. *See* SDCL 21–9–2(6).[2]

■ The equitable remedy of specific performance is always addressed to the sound discretion of the trial court, according to the facts and circumstances in each case. *Estate of Gosmire,* 331 N.W.2d 562 (S.D.1983); *Dolan v. Hudson,* 83 S.D. 144, 156 N.W.2d 78 (1968) *aff'd reh'g* 83 S.D. 331, 159 N.W.2d 128 (1968). This court, in examining an award of specific performance on review, looks to see whether the trial court abused its discretion. *Dolan, supra.* The presumed remedy for the breach of an agreement to transfer real property is specific performance. SDCL 21–9–9.

Shewmakes delineate two assignments of error surrounding the contingency clause of purchaser being able to obtain a "13% conventional loan." First, they argue that the clause is too ambiguous to allow an award of specific performance. Second, they contend that they made a sufficient effort to obtain such financing, were unable to do so, and are thus excused from performance on the contract.

■ There is no ambiguity to preclude specific performance of a contract if its terms are sufficiently certain to make the precise acts of the parties to be done clearly ascertainable. *Dolan, supra; Crawford v. Carter,* 72 S.D. 514, 37 N.W.2d 241 (1949). In construing a subject to financing clause the Supreme Court of Wisconsin stated that the circumstances surrounding the contract can make the clause sufficiently certain enough to grant specific performance. *Gerruth Realty Co. v. Pire,* 17 Wis.2d 89, 115 N.W.2d 557 (1962). The primary objective of such a clause is to establish a meeting of the minds between the parties on what financing would be affordable or desirable to the buyers and acceptable to the sellers. *Perkins v. Gosewehr,* 98 Wis.2d 158, 295 N.W.2d 789 (App.1980). Enforcement by specific performance of a residential real estate purchase contract does not require

---

**2.** SDCL 21–9–2 provides:
 The following obligations cannot be specifically enforced:
  . . . .

(6) An agreement, the terms of which are not sufficiently certain, to make the precise act which is to be done clearly ascertainable.

an expansive recitation of mortgage financing details.

> Excessive detail may be counter productive to enforcement of the contract by unwarrantedly narrowing the contingency clause to an extent that makes its fulfillment improbable. It also ignores the fiscal realities that the total effect of the financing terms is often more important than the variation in individual details which often offset each other. For the later reason, financing clause terms are better stated in essentials so that inconsequential variances resulting from current financial market conditions do not preclude consumation of the transaction. Considering the question of definiteness in the context of financing essentials comports with the realities of a purchase of residential real estate.

*Perkins,* 295 N.W.2d at 792–93 (footnote omitted).

The totality of the circumstances surrounding this financing contingency make it sufficiently definite to support the remedy of specific performance. This court has stated that exact certainty of all terms is not needed to enforce a decree of specific performance. *Habeck v. Sampson,* 88 S.D. 437, 221 N.W.2d 483 (1974); *cf. Crawford, supra.* The trial court found that "conventional loan," as used in the agreement, is a loan directly through a local lending agency not guaranteed by a governmental agency. Several local banking officials testified that this was the common understanding of the term. *See also Khabbaz v. Swartz,* 319 N.W.2d 279 (Iowa 1982). Shewmakes contend that they assumed the language meant a long-term loan and that they were obligated under the agreement only if they procured long-term financing suitable to them. This contention lacks weight, as Shewmakes obtained a seven-year loan on another home they purchased approximately sixty days later.

Although Shewmakes failed to obtain 13% conventional financing prior to the closing date of the transaction, the trial court found that this condition was not excused, as the Shewmakes had failed to use due diligence in attempting to obtain the required financing. Norwest Bank in Brookings had committed to a 13% loan, which Shewmakes refused to accept.

Where a purchase agreement contains a contingency relating to financing, the purchaser is under a good faith duty to attempt to obtain financing. *See Pease v. Brown,* 186 Cal.App.2d 425, 8 Cal. Rptr. 917 (1960); *O'Halloran v. Oechslie,* 402 A.2d 67 (Me.1979); *Endres v. Warriner,* 307 N.W.2d 146 (S.D.1981). A purchaser, such as the Shewmakes, is under an implied promise to use his best efforts to bring about the happening of the condition. *Endres, supra.* Shewmakes did indeed fail to exercise their best efforts when they refused to accept offered financing which comported with the exact language of the purchase agreement.

When a purchaser has failed to exercise the due diligence required in an attempt to meet a condition of the contract, this failure can result in breach of the agreement. *Pease, supra; O'Halloran, supra; Endres, supra.* The trial court found Shewmakes failed to use due diligence in attempting to obtain a financing arrangement and held them in breach of the agreement. We agree.

Shewmakes also contend that the trial court erred in allowing consequential damages in conjunction with specific performance. The trial court found that Wiggins incurred expenses in the form of real estate taxes, insurance, interest and utilities, which were proximately caused by Shewmakes' breach. The trial court then awarded recovery for these expenses in the form of consequential damages.

A court, sitting in equity, may award pecuniary compensation to a plaintiff along with specific performance when the decree of special performance does not provide full and complete relief. *See Brockel v. Lewton,* 319 N.W.2d 173 (S.D. 1982); 71 Am.Jur.2d *Specific Performance* § 216 (1974); Restatement (Second) Contracts § 358(3) (1979). Allowable pecuniary

expenses include those items for which the trial court awarded damages. *See generally* 71 Am.Jur.2d *Specific Performance* § 219 (1974).

Accordingly, we affirm the decision of the trial court in all respects.

All the Justices concur.

WUEST, Circuit Judge, acting as a Supreme Court Justice, participating.